Good morning, everyone. I'm pleased to be doing today a call-in to the court in Stapleton. And before we move to the cases we have, I'd like to call on Attorney Marjorie Rose Roberts. Stan, would you like to move the admission of the members of the board to the 3rd Circuit? Yes, Your Honor. My name is Marjorie Roberts. I've been a member of the 3rd Circuit since 1989. And I'm delighted this morning to move the admission of my three attorneys who work with me. Rene Andre, who until recently worked for Judge Gomez. And Joe DiRusso, who moved here from New York not too long ago. And Travis Wright. And which members, which bars are they currently members of? Rene is a member of the Virgin Islands Bar, as well as the Bar of West Virginia. And Joe is a member of, I think, four bars. I believe Florida, New York, New Jersey, and the Virgin Islands. And Travis is a member of the bars of the Virgin Islands and Oklahoma. As well as, I think, Joe has, we've got a few tax courts in there, as well as a court of claims. I recognize, obviously, Renee.  Thank you, Joe. And you, Joe? Travis Wright. Travis Wright. We welcome all three of you. And we're pleased that Mr. Roberts is here to move your admission. We're hopeful that we'll have an opportunity in some future visits here to the Virgin Islands to appear before our courts. We've got a number of outstanding attorneys this week, including our city. It's always a pleasure to work with you. We're glad you're here. Thank you. Good luck this week.  And have a happy new year. Thank you. Thank you. Thank you. Congratulations. Thank you so much. Thank you. You're welcome, but don't feel like you have to. Okay, our first case will be United States of America. First, please, Alan George. You're next. Thank you, sir. Good morning. I don't know if we can discuss this. I'm so sorry. Good morning. I just wanted to start out. My name is Alan George. I'm a Catholic. I'm a Catholic. I'm 16. My name is Alan George. I would, I guess I would like to request a request for a full three minutes for Mr. Roberts. I just have a few questions. Thank you. I just have a quick question. First, North Dixie, the potency of the evidence with respect to the falsity of the statement, specific intent, anti-Semitism, suspicion, both North Dixie with respect to the falsity of their statement, the evidence that went through by falsity, there was a lot of evidence. However, North Dixie, there was evidence that, indeed, there were at least three instances where the amount of evidence reported was sent back, was sent from North Dixie and was sent back to Atlanta, Georgia, where a co-dependent's son was then driving away. Obviously, that was on January 9th, 10th, and 11th. Also, there was also evidence that the amount of reports that were sent back on January 25th, 2001, being that they were backed up within one hour from St. Thomas up to Florida and backed down to St. Thomas and subsequently to the first town of Colorado. I think that, at minimum, the fact that there was evidence that showed that at least the amount of things that were in fact taken and subsequently resolved by a FedEx up to Atlanta, Georgia, that raises the question as to whether you at least have some amount of evidence also for that, you know, those three accounts of the false charges. Mr. Janda, aren't we required to look at this in light, most favorable to the government of the state? Yes, Your Honor. But I think that, specifically with respect to those three days, that raises the question as to whether or not they were not done. Well, I don't necessarily disagree with you that it's conceivable that a jury could have seen it differently, but this jury didn't see it differently. And are we in a position where we have to say it was irrational for the jury, looking at the evidence as a whole, to say that given Mr. George's behavior in the case, including that he was sending cassettes that were being used, including that the pumps on site were apparently not working or was not working on a regular basis, and including that the reports were faxed back to him almost instantaneously, and including his other knowledge of what was going on in the case, is it really so that it would be irrational for a juror to say that he knew this was all just so much smoke and mirrors? Well, I think to answer your question, I think we have to just retract just a little bit and just point out that we have to note that, upon George, he did in fact, you know, he by point got the contract for a 10% abatement, but you know, noticeably in that contract it did not include the air monitoring requirements. And I think that was actually conceded during the course of the trial, that Mr. McFarland in fact indicated that, for example, in the trial he actually hired Mr. Stone, that once apparently George submitted his bid, and they went through his document, they realized that it did not include anything with respect to the monitoring that they went through in the trial of George, and that he in turn presented Mr. Dillenstein to them, and they entered into agreement with Mr. Stone for him to be the qualified person to conduct the air monitoring. And also, it's important to note that, with respect to the air monitoring, Mr. Dillenstein was the one who published the interview. And Mr. Dillenstein, at the time that he left, he was in fact in the Virgin Islands on January 2nd, and then he subsequently left on January 9th. But when he returned back to the city, he had appointed a person to train. And it's important to note that Mr. Pete Allen George Auger, the testimony was that he was on a drop site every day, unlike Mr. Starks. The testimony was consistent in that he appeared not to go to the cars on the drop site, that he was also in an area on the drop site. I'm saying that we can come to the conclusion that in fact he must have known everything that was stated in the testimony and the monitoring. Well, but I put it to you again, the question for us is not whether a jury could have seen it differently, but whether a jury would necessarily be irrational to see it the way the government defends it. What can you point us to in the record that undermined the assertion that Mr. George was so heavily involved as the on-site, day-to-day, supervised authority that he knew what was going on, he knew the monitoring was issued? The question to me is what evidence I can point to that would, that he did not know that it was a chance, that he did not know. Yeah, what is, they presented evidence, they presented evidence to the jury, which the jury accepted fully, and from which the jury inferred Mr. George's state of mind. I'm asking you, and maybe there isn't any, but I'm asking you to point me to any positive evidence in the record that undermines that. Well, although the government pointed out in its brief that indeed Mr. George had gotten a number of certificates, one of them was a contractual supervisor certificate, and part of that force did in fact get some training in technical monitoring, but the, you look at the test questions as to what it is not going to do, the depth of the monitoring work that he was doing, as a matter of fact, in his own bed, he did not receive any information that he was doing, as a matter of fact. So the question becomes whether or not he was so qualified that he must have known, given, and you know, I am aware and so forth, that he was familiar with that, that he put that in his document, but I don't think that it does come to the conclusion that he was so knowledgeable about data and monitoring that he must have known every single detail with respect to what was required under the contract that he signed. Your Honor, you're asking me to point to something, I can't point to something per se, but I can point to the fact that the evidence with respect to a test of abatement, I mean, that evidence was very, very strong, and we did not comment that here, but I think that what may have been the kind of, with respect to his failures with the test of abatement, and here we have the most miniscule evidence with respect to the false statement, and we have to put all of that together, and in fact, we're running, so I think it's important that we look at the evidence closely with respect to the false statement, to determine whether or not that was in fact the true evidence. With respect to the falsity of the report, here we did not have any evidence that, you know, showed completely that the fact in the report was that everything contained in the report was false. We didn't have any evidence as well that showed up in fact that there might have been false words in the report. Is it not enough that the misrepresentation was made that they didn't actually come to monitoring when the fact happened? Isn't that falsehood in and of itself, whether or not by sheer luck, well, it does. The information they provide through aid turned out to have been accurate in some respect, but is it the fact that the monitoring was never done? Well, I don't think that I could agree with the statement that the monitoring was never done, because you had testimony from Mr. Bradley, and he said that was five days before it happened. Well, let me interrupt you, because if the guardians just shoot me out, I want to make sure I understand correctly, because that's what my question goes to. I thought your point that you were just making was that the statements weren't actually false, and there wasn't proof they were actually false, and I understood implicit in your question to be nobody proved that the air quality wasn't what was represented to be on the floors. Now, if that's your argument, what I'm asking you is, even accepting that that's true, and I don't, but accepting for the sake of argument, I don't mind, even accepting that that were true, what difference does it make? Because the falsehood that the government appears to rely on is that the foundation of the conviction. So I'm asking you, as a legal matter, are they right or wrong about that? Well, I could speak at the government's expense. Okay. The court made the right decision, which was the court decided that the evidence was one, non-violence was required almost a year after the conduct that you see in this case, and two, that it would be undue prejudicial to allow that evidence in. However, the court subsequently reversed the court and allowed that evidence in, and I think that it's important to note that with respect to actually proving that the material being handled, that this wasn't part of the proof, as part of the burden that was attached to it, that this material, and I think that this was the first glimpse that the truth had of the actual situation of the homicide that was being handled, and I think that the court decided to allow this evidence for the first time. Even if it wasn't a case of destruction, would the other evidence of this include the jury? Would you really say that this was a case of destruction? I'm afraid I would have to say so, because, you know, Paul and Bill, fellows are all in the case, this was the first case that the jury actually had of the truth of the case, and I think that the court should hear this kind of talk, and I think that there was a lot of discussion about that. Do you have anything to add, sir? With respect to the sentencing, I think that the court basically relied on a pre-sentence report, and there was a lot of testimony produced in the sentencing, and I think that the court actually considered a pre-sentence report to try to prove facts, and I think that what would be appropriate here would be a remand for sentencing purposes, and I think that is what is required. Okay. Congratulations. Thank you. Okay, why are we here? Ms. Ellis, may we have you back, please? Good morning, and may it please the court, my name is Anna Pat Ellis, and I'm from the United States. With me at the table is Mr. Fuchs. Mr. George, I'll get the issues in the order that they were taken by my opposing counsel, and with respect to the false statement counts, there was certainly substantial evidence, and I think that Judge Jordan made the appropriate point that this evidence must be viewed in the light most favorable to the government, and also, as we cite in our brief in the United States, this evidence does not need to be inconsistent with every conclusion to save that appeal. Here, to run down through the evidence regarding on the false statement counts, George was trained and certified in OSHA's air monitoring requirements, that was part of his training, and the United States submitted evidence of his training, including tests that he took on OSHA's air monitoring requirements. Mr. George was at the site every day and would have seen the air monitoring not properly done, would have witnessed that. Can you speak to your opponent's opinion on that subject, that that requires an assumption in which there was not sufficient evidence that Mr. George knew what was going on with him, and that there wasn't evidence to show you how it was supposed to happen, and therefore it was unfair and inappropriate to take him on that? Well, yes, Your Honor. Certainly, he was trained in these requirements. It was part of his licensing. It was part of his certification. He was at the site, witnessed this occur. It was also, there was testimony from Mr. Soukram that Mr. George informed him that he was sending the cassettes to STARNs for analysis every day. That also shows that Mr. George understood the requirements, understood that these were supposed to be analyzed, and the results submitted within 24 hours. The test, I mean, his testing, his licensing, I think that's one of the most important things, Your Honor. This is part of his job to be knowledgeable in these requirements, and there's evidence that he, in fact, was more than that. Well, hold on. When you say there's evidence that he, in fact, was knowledgeable about these requirements, is there anything in addition to he said I'm sending the cassettes, and he recorded it to you at your site, that shows he knew how monitoring was supposed to be done?  His certification. His certification, Your Honor. And the testimony we even have in their test, and the test he took for the certification included questions on the air monitoring requirements. This was a fundamental part of doing this project with the air monitoring, and there's certainly substantial evidence, even in the light and favorable to the government, that George was aware of this. And the testing and the certification were in that case, right? Correct. Correct, Your Honor. So beyond that, he was there. He told Mr. Sugrum that he was sending these cassettes to Mr. Storms for analysis. He did not, in fact, use them. And Mr. Beck, you've spoken about there was evidence in the record of three FedExes sent to Mr. Storms from Mr. George throughout the whole period. We don't know what was in those packages. However, when you look at the totality of the evidence, including the fact that the air monitoring was never properly done, that these cassettes were being reused, and the reuse of the cassettes renders them invalid, and that evidence as well, then you have the evidence that the reports were not submitted to EHA as required. These were supposed to be submitted every 24 hours. What happened here is that EHA issued a notice of violation because it had not been receiving the reports as necessary. When that happened, and that was submitted, the notice was issued to Alvin Williams, who noticed Mr. George. Mr. George immediately faxes Mr. Storms' forms, has them filled out, even though the cassettes had never been sent. And after that, then they are sent to EHA, or they are sent in from EHA. All of that evidence. So I think the mere fact that three packages had been sent to Mr. George, when you view the totality of the evidence, even though it was favorable to the government, it certainly supports the conviction on these counts. With respect to the falsity, Your Honor, it is certainly the government's position that whether, if Mr. George and Mr. Storms might have lucked out, if this analysis had been done and the error was found to be within acceptable limits, it doesn't matter. The falsity is a lie. The analyses were done. This is a federal requirement to conduct error analysis, error monitoring analyses, every 24 hours. They lie. The lie is telling the government that the reports, the analyses were done. They were not done. So that satisfies the falsity element. If there are other... For the false data accounts. I'm not aware, Your Honor, I mean, that case I'm not aware of at the moment. I mean, what we cited in our brief, the standard from United States v. Kern for a false statement is acting deliberately with knowledge that the statements were not true. I don't know if that has been overruled. I apologize for that. But I think that, and that would be our position, that whatever the intent requirement here, I mean, when you have this kind of certification and this clear evidence of the knowledge of the requirements involved, I don't think there could be any question that you have the requisite intent to make a false statement on that point. All right. What about the 2002 testimony? Well, it's certainly our position, Your Honor, that there was no abuse of discretion by the court in allowing that testimony to come in. As we have... I can see your argument on time. Okay. But wasn't the sample that was analyzed taken from a different building, a building that had not been... That's correct, Your Honor. How does that prove that there was no abuse of discretion? Well, there was also testimony that these buildings were homogenous. These were all the same. And this was a public housing complex. They were not different in structure. There was testimony that was from Urban Mesa on that, that the buildings were all the same. They were not different. And the government put in further evidence that there had been no changes to the structure in between the time of the conduct and the time that these samples were taken. So there's nothing suggesting that Building 31 was any different from the other buildings. They were all structurally the same. The government established that at trial. And in addition, Your Honor, you made the point that the government also proved the existence of asbestos in two other ways, so for a total of three ways. There was a 1996 survey. The reason that this was the asbestos remediation contract was necessary. The reason the work was necessary. That established it. And then you also had Leonard Reed testifying regarding the presence of asbestos. I brought up the samples earlier. So he took... Leonard Reed took seven samples on February 12, 2001. He sent six for analysis. He had Essex Country testify that they contained asbestos. And then the 1996 survey, he had Rolando Watley, 86 of 88 ceiling samples contained asbestos. How do you deal with the district judges who, in the first go-round, allow the dissenters to say, this is what the district judge said, this is what it's been, this is what it's been, which is apparently a violation of the state bar. And the judge came to say, there's other things that were going on, other pieces of evidence. But if that evidence is true, it's tainted with the dissenters' markings. It doesn't have that. No, Your Honor, it doesn't. It doesn't. I mean, it's a year after the fact. We have studied this on our review. There's no bright-line rule to when evidence is too remote to be prejudicial. It's pure. I mean, the defendant has had the opportunity and took the opportunity to point out to the jury that this was from another building and that this was the time after the fact. So the jury had this information. And it was able to use that information in the way that it wanted to. Right. I just need to know, you referred to point .403, which is something that the judge can weigh and keep stuff from the jury precisely because of fear that a jury will not be able to make distinctions about what is unfairly prejudicial. So you say the jury can figure it out and that kind of dots the main .403? Well, this just, I mean, the amount of time here, it doesn't, there's not a risk of undue prejudice here. Well, it initially thought there was, only the district court had a concern that the government would be able to establish that there weren't any structural changes. And the government established that, that addressed the district court's concern. And that's all in the record. The government then established that fact and then allowed the evidence to come in. So that cured the defect and allowed the jury to see that as well. So on that point, you know, the prejudice, the concern of the prejudice that the district court was concerned about was rectified in the trial. And in addition to that, the defendant was able, or the defense was able to point out for the jury that this was from another building and that it could come at the date of the subject. So all of those, barred against any evidence of prejudice in this case, were used to do the second part. What about the sentencing that you do? The question of the two-point assessment on the 3B1.3, which is to apply your special skill to reduce the cost to the public. Correct, Your Honor. It appears that that amendment is not available in addition to 3B1.1, which is already 2B, your special skill. I disagree with that characterization. Why? You both asked that the 3B1.3 provides if this adjustment is based upon an abuse of the position of trust, it may be employed in addition to an adjustment under 3B1.1. If this adjustment is based solely on the use of skill, it may not be employed in addition to an adjustment under 3B1.1. I think that's also fleshed out in the United States v. Tiefman case. So the prohibition there is that if there's an enhancement for role in the offense, which we have here, we cannot have a 3B1.3 enhancement solely for use of special skill. So the pertinent requirement here would be whether the district court found the abuse of trust, and it did. That's in the record. You think that is in the record? That is the district court found that. As to Mr. George? As to Mr. George, yes. That is in the record. It's in the district court's statement and sentencing that he found the abuse of trust. Let me see if I can find that for you.  He certainly found the abuse of trust. If there are no further questions, the United States will conclude. Thank you. Yes. Just starting from the end, working back with respect to what you said before, I'm terrified that Mark is going to do the same thing. I'm not so sure that in fact it is in the record. If so, I think that the district court perhaps was in error. I'm talking about the probation office was wrong in doing so. Insofar, with respect to this abuse of trust, I think it would be more acceptable for the defendant, not the defendant, George, didn't the judge say that he was relying on the same evidence that was already organized for either of these and that those pieces of evidence also speak to an abuse of trust which I have acquired in mind. Certainly, the court may have been more fulsome in starting to reconceive this record of evidence that the judge looked at and said there was an abuse of trust. Working back, once again, looking at the pros and cons of the sample investigation, I think in addition to the mere fact that this other paper could have come before the jury, but we also have to consider that the jury actually got this most vivid testimony two times. The testimony came out before and during the hearing. One such testimony that the court considered in the court has to do with the fact that I think it's based on the record. When the court recorded that ruling, the same evidence came out a second time. I think it basically doubles the prejudice that George suffered as a result of his conviction as the court pointed out. Indeed, the evidence did not seem anywhere in any of the cases that we want. During the process of examining, I called on George's counsel in front of one of the counsel's witnesses whether or not if it was true that during the time that the court was taking this case, the people of the community, the fact that there were those kinds of cases that George committed, and that up until that point, if there were any problems with the speculative case or whatnot, that indeed, it can actually come to light in the next couple of years. And he also admitted that he had no knowledge as to what this means as far as the department and the people of the community. So I think this unresolves the fact that indeed, so as long as other evidence is tested, other evidence is done, it resolves the connection to the activity of this case. The friable asbestos here when the popcorn is being sprayed on and asbestos is being seen, yes, as well as in the house. And there was evidence, right, that those ceilings, they date from the creation of the project, right? Yes. So, at least you're arguing that the maintenance people might come in     are very concerned about that. And I think that the people of the community are very concerned about that. And I think that the testimony that we got was just a testimony for the fact that we were raising the question as to whether or not perhaps the ceilings were being impacted so that they could apply something over that ceiling to the popcorn and the other ones that were being sprayed on. And just lastly, real quick, with respect to the testing, I think that the question that Senator Scott has pointed out, looking at those tests, and what I'm going to ask you to look at, it just basically has nothing more to say. From literally the amount of those, it didn't really delve into the type of knowledge that would be required of an individual like Edmund Starnes here, when Edmund Starnes was the one who basically, when the first aircraft ran out of fuel, he came initially to Senator Starnes who did the call about this, he came  to Defendant George, he immediately called up Senator Starnes and said, Senator Starnes was the one who gave the direction for what should happen. So, with respect to the amount of knowledge that  Starnes had, I think it's important to know that if he, Senator Starnes didn't have anything to do other than the instance whereby he would collect his properties and the few instances where perhaps those properties were taken            I think it's important to know that Senator Starnes didn't have anything to do other than the few instances where              and the  instances where he would collect property from himself or somebody else , he would have nothing matter